**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

TONI GORDON,

         Plaintiff,

vs.

GERARD TREATMENT PROGRAMS,
L.L.C.,

         Defendant.

No. C 04-3048-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
SUMMARY JUDGMENT**

———————————

**TABLE OF CONTENTS**

*I.* *INTRODUCTION* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  *A.* *Procedural Background* . . . . . . . . . . . . . . . . . . . . . . . . . . 2
  *B.* *Factual Background* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    *1.* *The parties* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4
    *2.* *Gerard's FMLA policies* . . . . . . . . . . . . . . . . . . . 4
    *3.* *Gordon's need for FMLA leave* . . . . . . . . . . . . . . . 5
    *4.* *Incidents during Gordon's FMLA leave* . . . . . . . . . . 6
    *5.* *Gordon's termination* . . . . . . . . . . . . . . . . . . . . . 9
    *6.* *Subsequent events* . . . . . . . . . . . . . . . . . . . . . . 12

*II.* *LEGAL ANALYSIS* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12
  *A.* *Standards For Summary Judgment* . . . . . . . . . . . . . . . . . . 12
  *B.* *Arguments Of The Parties* . . . . . . . . . . . . . . . . . . . . . . . 15
    *1.* *Gerard's argument for summary judgment* . . . . . . . . . . . 15
    *2.* *Gordon's response* . . . . . . . . . . . . . . . . . . . . . . 16
    *3.* *Gerard's reply* . . . . . . . . . . . . . . . . . . . . . . . . 18
  *C.* *Retaliation Claims Under The FMLA* . . . . . . . . . . . . . . . . 18
  *D.* *Gordon's FMLA Retaliation Claim* . . . . . . . . . . . . . . . . . 20
    *1.* *Gordon's prima facie case* . . . . . . . . . . . . . . . . . . 20

       2.     *Gerard's legitimate reason* . . . . . . . . . . . . . . . . . . . . . . . 22
       3.     *Gordon's showing of pretext and retaliation* . . . . . . . . . . . 23
           *a.*      *Gordon's showing of pretext* . . . . . . . . . . . . . . . . . . 24
           *b.*      *Gordon's showing of retaliation* . . . . . . . . . . . . . . . 28

**III. CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

T he question that animates the dispute between the parties in this case, on the defendant's motion for summary judgment, is whether an employee can assert a claim for retaliation in violation of the FMLA, where she was terminated upon the conclusion of her FMLA leave for failure to provide a fitness-for-duty certification as required by her employer. Although pertinent regulations expressly authorize an employer to terminate an employee who fails to provide a fitness-for-duty certification at the time that FMLA leave is concluded, 29 C.F.R. § 825.311(c), the court nevertheless concludes that the viability of a particular employee's FMLA retaliation claim, where her employer has exercised that authority, depends upon the specific circumstances of the case.

## I. INTRODUCTION

### A. Procedural Background

Plaintiff Toni Gordon filed her Complaint in this matter on June 1, 2004, against her former employer, defendant Gerard Treatment Programs, L.L.C. (Gerard), alleging that Gerard refused to place her in her original job or an equivalent job with equivalent pay, benefits, and other employment terms and conditions, upon the completion of leave pursuant to the Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601-2654, and instead, discharged her, even though she was ready, willing, and able to perform all

of the duties of her job. *See* Complaint, § V (docket no. 2). Gordon seeks restoration to her original job or an equivalent job, compensatory and liquidated damages, reasonable attorney's fees, and costs. Complaint, § VI. Gerard answered Gordon's Complaint on June 30, 2004, denying Gordon's claim, and asserting, as an affirmative defense, that Gordon had exhausted her FMLA leave, but failed to provide medical information concerning her ability to return to work prior to that date. Consequently, Gerard contends that it acted in good faith and upon reasonable grounds in terminating Gordon. Answer, § V (docket no. 3). Trial in this matter is now set to begin on December 19, 2005.

On July 12, 2005, after being granted a two-month extension of time to file dispositive motions, Gerard moved for summary judgment in its favor on Gordon's FMLA claim (docket no. 10). The extension of the dispositive motion deadline also necessitated rescheduling the trial in this matter from September 26, 2005, to December 19, 2005. Gordon resisted the motion for summary judgment on August 5, 2005 (docket no. 12). Gerard then filed a reply in further support of its motion for summary judgment on August 15, 2005 (docket no. 13). Neither party requested oral arguments on the motion for summary judgment. Therefore, Gerard's motion for summary judgment is deemed fully submitted on the parties' written submissions.

### B. Factual Background

The court will not attempt a dissertation of undisputed and disputed facts, but only a statement of sufficient of the undisputed facts and the nature of pertinent factual disputes to put in context the parties' arguments for and against Gerard's motion for summary judgment. Because Gordon does not allege that Gerard improperly denied her request for FMLA leave, or that Gerard did not give her all of the FMLA leave to which she was entitled, but that Gerard engaged in misconduct at the *end* of her FMLA leave, the focus

of the present factual statement is on the events surrounding Gordon's discharge from her position at Gerard. Nevertheless, the court will also discuss briefly the circumstances giving rise to Gordon's FMLA leave and significant events during her FMLA leave.

### 1.    *The parties*

The parties agree that defendant Gerard is the nonprofit equivalent of an indirect subsidiary of Nexus, a Minnesota nonprofit corporation, and that Gerard provides services for children with severe and emotional behavioral disorders. They also agree that plaintiff Toni Gordon began working for Gerard on October 4, 2002, as a counselor in the Day Treatment Program at Gerard's Fort Dodge, Iowa, facility. At the times pertinent here, the parties agree that Gordon's regular full-time schedule was thirty hours per week, six hours per day, based on Gerard's staffing needs for the "census" of children in the Day Treatment Program. The parties appear to agree that it was important for Gerard to maintain adequate staffing levels to meet state mandates and to restrain children, if necessary, although they disagree on what those staffing levels might have been and whether Gerard was actually meeting them. Gordon contends that she was often on her own for periods of each day, as the only counselor on the floor, because her immediate supervisor, Lori Wheeler, often would not come in until 10:00 or 11:00 a.m., and the third employee at the site, Sonja Bock (or Bach), did not come in until the afternoon.

### 2.    *Gerard's FMLA policies*

The parties do not dispute that Gordon received an employee handbook for the Nexus family of companies, which included information about FMLA leave. Nor do they dispute that Nexus also had an established policy for FMLA leave. That policy provided, *inter alia*, that, upon conclusion of FMLA leave, Nexus would place an employee in the same position that the employee occupied when the employee's leave commenced, but that Nexus was not required to place the employee in another position, if the employee was

unable to perform the essential functions of his or her pre-leave position.  The policy also provided that, if an employee took leave for the employee's own serious health condition, the employee was required to provide a "fitness-for-duty" certification before returning to work.  Pursuant to the policy, an employee was required to confirm his or her return to work date five working days prior to the end of the employee's FMLA leave.

### 3.      Gordon's need for FMLA leave

Gordon's need for FMLA leave arose from her hospitalization on December 1, 2003, for chest pain, tremors, nausea, memory loss, and weight loss.  In the course of Gordon's deposition, Gordon agreed with opposing counsel to refer to this condition as her "tremor condition," and the court will use the same term to describe the condition.  The court need not explore the precise nature of Gordon's tremor condition, because the parties do not dispute that it was a serious health condition that qualified for FMLA leave. Gordon was hospitalized for her tremor condition on December 1 through December 3, 2003, and again from December 11 through December 12, 2003.

Gordon informed Gerard of her need for FMLA leave on December 1, 2003, and Gerard responded with a letter dated December 3, 2003, from Christina ("C.J.") Dodge, Gerard's Human Resources Manager, informing Gordon that she qualified for 12 weeks of unpaid FMLA leave.  Among other things, the letter from Dodge stated the following, in the penultimate paragraph:

> Five working days prior to the end of your leave, you must contact the Human Resources Department to confirm your return to work date.  If your leave is for your own serious health condition, you must provide a "fitness for duty" physician statement before returning to work.

Defendant's Appendix at 20.  The letter did not provide any required form for certification of "fitness for duty."  However, the letter did have attached to it an "Employer's Response

to Employee Request for Family and Medical Leave," which indicated that the requested leave would be granted and that Gordon would be required to present a fitness-for-duty certificate prior to being restored to employment. Defendant's Appendix at 21-22. The "Employer's Response" also stated, "If such certification is required but not received, your return to work may be delayed until the certification is provided." Defendant's Appendix at 22, ¶ 7. The "Employer's Response" did *not* indicate that failure to provide the certification could lead to termination.

### 4. Incidents during Gordon's FMLA leave

On December 22, 2003, and again on January 7, 2004, Gordon provided health care providers' certifications that she could not return to work. Defendant's Appendix at 23-25. However, on January 16, 2004, Gordon provided a doctor's note stating that she could resume working on January 20, 2004, part-time, for four hours every morning, until further notice. Defendant's Appendix at 26. Dodge then filed a "Personnel Change Report" for Gordon on January 20, 2004, indicating that Gordon was returning to work with restrictions and that she would still be on FMLA leave for regular hours that she could not work. Defendant's Appendix at 27. The parties agree that two hours per work day were treated as FMLA leave, because Gordon was able to work only four hours of the six she would ordinarily have been scheduled each day. Gordon submitted a note dated January 30, 2004, from D. Johnson, Ph.D., a licensed psychologist, authorizing Gordon's return to work for four hours per day of direct contact time with children in the morning, with an additional hour of non-contact time, for paperwork, etc., per day. Defendant's Appendix at 28. Gordon also provided another note, dated February 9, 2004, also from D. Johnson, restricting her to four hours of work only, and stating that the work needed to be only in the morning. Defendant's Appendix at 29.

Gordon suffered a work-related injury at Gerard on February 10, 2004, when she was punched in the chest by a client during a confrontation. She was then off work completely for a period of time, because of that injury. There does not appear to be any allegation that Gerard miscounted sick leave arising from this work-related injury as FMLA leave.

On March 5, 2004, Dodge wrote Gordon a letter that, *inter alia*, challenged the validity of the notes from D. Johnson imposing work restrictions because of Gordon's tremor condition, because other notes were "provided by a different medical doctor, who did not indicate a mental health issue." Consequently, the letter from Dodge required Gordon to provide an updated medical opinion on Gordon's ability to work a normal work schedule by March 10, 2004. Defendant's Appendix at 35. The March 5, 2004, letter also stated,

> [O]ur records indicate you will exhaust your FMLA entitlement as of the week of March 8th. Consequently, your job will no longer be guaranteed, your benefits will no longer be maintained, and as of April 1, 2004, you would be offered benefit continuation through COBRA. Failure to meet the expectations outlined above may jeopardize your continued employment with Gerard.

Defendant's Appendix at 35. Gordon contends that she responded to this letter by asking Dodge if her job was in jeopardy, and that Dodge assured her that it was not. Indeed, Gordon contends, and Gerard denies, that Dodge and Wheeler (Gordon's immediate supervisor) repeatedly told Gordon that her job was safe and that all she had to do when she ran out of FMLA leave was to apply for personal leave until she could return to work full-time.

Gordon was not convinced that Gerard's calculation of her FMLA leave in the March 5, 2004, letter was correct. On March 9, 2004, Dodge wrote Gordon another

letter, stating that it was in response to Gordon's request "for confirmation of [her] FMLA balance." The March 9, 2004, letter stated that Gordon would exhaust her FMLA leave on March 16, 2004, if she worked the hours estimated on March 10, 11, 12, 15, and 16. Defendant's Appendix at 36. The parties now agree that Gordon did not actually exhaust her FMLA leave until March 29, 2004. *See, e.g.,* Defendant's Appendix at 40 (summary of Gordon's FMLA hours by end of pay periods). Gordon contends that Gerard persistently miscalculated her FMLA leave and the date on which that leave would be exhausted.

Gordon was released to return to work after her work-related injury on March 12, 2004. However, the parties agree that she continued to work restricted hours owing to her tremor condition. Specifically, Dr. Raval, Gordon's primary treating physician, provided a note dated March 7, 2004, authorizing Gordon to work in the mornings, Defendant's Appendix at 31, and a similar note on March 9, 2004, authorizing Gordon to work for four hours in the morning, from 7:30 a.m. to noon. Defendant's Appendix at 32. The parties do not dispute that Dr. Raval's notes satisfied Gerard's request, in the March 5, 2004, letter, for an additional medical opinion concerning Gordon's ability to work her normal schedule. Dr. Raval provided another note on March 15, 2004, authorizing Gordon to attend "meetings" when needed, and yet another note on March 23, 2004, clarifying that, "[i]n addition to working 7:30 a.m. to noon, [Gordon] may attend meetings." Defendant's Appendix at 34.

Gordon had not provided a fitness-for-duty certificate prior to March 29, 2004, the date that the parties now agree that her FMLA leave actually expired. However, she contends that she had advised Wheeler and Dodge prior to that date that she had an appointment with a specialist in Iowa City on April 5, 2004, which had been set up by Dr. Raval. Gordon also contends that she told Wheeler and Dodge that she expected to be

fully released for work after that appointment. Gordon also contends that she had attempted to get the appointment with the specialist moved up, but that Dr. Raval was unable to get an earlier appointment for her with the specialist.

### 5.    *Gordon's termination*

The parties agree that Gordon met with Dodge and Wheeler on March 26, 2004, and that, during that meeting, Gordon was advised that she was being terminated effective April 9, 2004. However, the parties dispute the precise reasons given for Gordon's termination.

In an e-mail dated March 28, 2004, to Lu Ann Parnell, a Human Resources Consultant for Nexus, Dodge stated that she had explained to Gordon during the March 26, 2004, meeting that "we were terminating her employment with Gerard/Nexus due to her current work restrictions," adding that Dodge had explained that, "at this moment we have no clear idea of when these restrictions would be lifted and it was becoming a hardship for the Day Treatment Program." Dodge's e-mail indicates that Gordon asked twice if she was being terminated because her FMLA leave had run out, but that, in response to the first such query, Dodge had "reiterated the facts to her again," and that, in response to the second query, she had explained that "[t]he decision was ultimately made because we didn't have a clear idea when she could return and it was becoming a hardship to the Fort Dodge Day Treatment Program," including "concerns about safety of not only children but staff." When Gordon asked if she could come back to work if Dr. Raval called and released her, Dodge wrote that she told Gordon "the decision was already made." The e-mail also indicates that Gordon was informed that she could work the two-week period (until April 9), but if she chose to do so, she was expected to remain "professional." Dodge's e-mail also reflects that she told Gordon that Gerard had not yet

hired a replacement, even though "an offer had been made," because the offer had not been officially accepted. Defendant's Appendix at 37.

Apparently at Dodge's request, Wheeler also prepared a memorandum of the March 26, 2004, meeting. According to Wheeler's memorandum, "C.J. [Dodge] told Toni [Gordon] it had been decided that she was terminated from Gerard because her FMLA had ran [sic] out, and it was uncertain when she could come back to work full-time so the safety of the clients and staff would be protected." Wheeler's memorandum reflects that Gordon told Dodge and Wheeler that she had an appointment on April 5, 2004, to "get her full-time status back." However, Wheeler wrote that "it was clarified to her [that] [t]he restrictions placed on her from medical leave put our agency in jeopardy and it became unsafe at times." Finally, Wheeler's memorandum reflects that Dodge "did encourage Toni to re-apply after her doctor approves full-time status with little restrictions, but at this time it is crucial that we have staff on board full-time." Defendant's Appendix at 38.

On March 29, 2004, Dodge sent Gordon a follow-up letter, which stated, in pertinent part, the following concerning the reasons for Gordon's termination:

> As Lori Wheeler and I informed you, we are unable to continue to accommodate your inability to work your full schedule on a consistent and regular basis. Our records indicate that since December 2, 2003 you have either been off work completely or you have been restricted to reduced hours. Since you are one of only three staff in the Fort Dodge office, it has posed a considerable hardship for us to maintain adequate staffing levels these past months, without risking harm to staff and clients. Nevertheless, we provided you job protected Family and Medical Leave to which you were entitled. Family and Medical Leave commenced on December 2, 2003 and has exhausted [sic] as of March 16, 2004. Since you are still unable to work your full schedule, we have had to make the difficult decision to end your employment with

10

> Gerard as of Friday, April 9, 2004. The process to find a
> replacement is underway.

Defendant's Appendix at 39.

In her deposition, Lu Ann Parnell, the Human Resources Consultant for Nexus, explained that Gordon was terminated because her FMLA leave had been exhausted and Gerard did not know when there was a reasonable expectation that Gordon would be able to return to work full-time. Defendant's Appendix at 6. Parnell testified, further, that part of the problem was Gordon's inability to provide restraints for children when needed, and the difficulty her leave had caused with maintaining state-mandated staffing levels. However, Parnell acknowledged that no effort had been made to hire additional staff to meet staffing mandates while Gordon was on leave, explaining that doing so would have caused budget problems. *Id.*

Gordon contends that she was terminated in retaliation for taking FMLA leave and questioning Gerard's calculation of her leave. She asserts that the only reason she was given for her termination was that she could not perform restraints. She points to what she argues are inconsistencies in the explanations given for her termination by Dodge, Wheeler, and Parnell. She also points to e-mails an comments from Dodge to Parnell in the weeks preceding her termination that indicated that Dodge described her as "continu[ing] to push the envelope" with regard to FMLA leave, as "challenging" Gerard's calculations of her FMLA leave, and as someone who was "going to become a problem" because of her questions about the calculation of her leave. Plaintiff's Appendix at 70 & 76. She also contends that Parnell did not even know the staffing requirements for the Fort Dodge office, undercutting Parnell's assertion that failure to meet state-mandated staffing requirements was the reason for terminating Gordon. Gordon contends that terminating her only exacerbated any staffing shortages, and that Gerard's refusal to

keep her when she was certified as fit for full duty, prior to her April 9, 2004, termination date, suggests that the lack of such certification was not the real reason that she was terminated. Gordon also points to testimony by Wheeler that there was no legitimate reason not to allow Gordon to return to work after she obtained a release for full-time employment.

### 6. *Subsequent events*

Gordon did, in fact, receive a full release to work after her appointment with the specialist, Dr. Worrell, on April 5, 2004. She submitted that release to Gerard on a form from the Fort Dodge Community Schools, *see* Defendant's Appendix at 44, because, she contends, Lori Wheeler had told her such a form would be adequate. Parnell responded to this release by e-mailing Dodge that "we wouldn't accept this as a valid work release," and questioning why any physician would sign such a "standard health exam form," when Gordon did not work for the Fort Dodge Community Schools. Parnell told Dodge that "no further action is needed at this time due to [Gordon's] 4/9/04 termination." Defendant's Appendix at 45. The parties do not dispute that no one ever told Gordon that the form she submitted from Dr. Worrell was deemed to be "unacceptable" or "invalid." Gerard contends that Gordon never reapplied for her position after she had submitted what she thought was an adequate release to full-time work without restrictions. Although Gordon was told that she could work at Gerard on an on-call basis after April 5, 2004, Gordon elected not to do so, and was never fully re-employed by Gerard.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

As this court has often explained, applying the standards of Rule 56 of the Federal Rules of Civil Procedure, the trial judge's function at the summary judgment stage of the

proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d 1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). The movant must make sufficient showing that there are no genuine issues of material fact and that it is entitled to judgment as a matter of law on the opposing party's claims. *See Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (on a motion for summary judgment pursuant to Rule 56, the moving party bears "the initial responsibility of informing the district court of the basis for [its] motion and identifying those portions of the record which show lack of a genuine issue") (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hospitals, Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). To defeat a motion for summary judgment, the opposing party must then meet its countervailing burden under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). As this court has also often explained, the rule in this circuit is that, because summary judgment often turns on inferences from the record, summary judgment should seldom or rarely be granted in employment discrimination (and retaliation) cases. *See, e.g., Crawford v. Runyon*, 37 F.3d 1338, 1341 (8th Cir. 1994) (citing *Johnson v. Minnesota Historical Soc'y*, 931 F.2d 1239, 1244 (8th Cir. 1991)). The court will apply these standards to Gerard's Motion for Summary Judgment.

However, the court must first observe that stating the legal principles of summary judgment in employment discrimination cases is a simple task. Applying those principles to the paper record that forms the judicial crucible that decides which plaintiffs may proceed to trial and which get dismissed is far more daunting. Missing in the standard incantation of summary judgment principles is the role of experience. Justice Oliver Wendell Holmes wrote, "The life of the law has not been logic; it has been experience." OLIVER WENDELL HOLMES, THE COMMON LAW 1 (1881). Thus, experience teaches that thoughtful deliberation of summary judgment in employment discrimination cases is grounded in the consideration of each case through a lens filtered by the following observations. Employment discrimination and retaliation, except in the rarest cases, is difficult to prove. It is perhaps more difficult to prove today—more than forty years after the passage of Title VII—than during Title VII's earlier evolution, and a dozen years after the passage of the FMLA, which is at issue here. Today's employers, even those with only a scintilla of sophistication, will neither admit discriminatory or retaliatory intent nor leave a well-developed trail demonstrating it. *See, e.g., Riordan v. Kempiners*, 831 F.2d 690, 697-98 (7th Cir. 1987). Because adverse employment actions almost always involve a high degree of discretion, and most plaintiffs in employment discrimination cases are at will, it is a simple task for employers to concoct plausible reasons for virtually any adverse employment action ranging from failure to hire to discharge. This is especially true because the very best workers are seldom employment discrimination plaintiffs—since the economic costs to the employer for discrimination are proportional to the caliber of the employee, discrimination against the best employees is the least cost effective. *See, e.g., id.* Rather, discrimination plaintiffs tend to be those average or below-average workers—equally protected by Title VII, the ADA, the ADEA, or the FMLA—for whom

14

plausible rationales for adverse employment actions are readily fabricated by employers with even a meager imagination. *See, e.g.*, *id.*

With the legal standards for summary judgment and the teachings of experience in hand, the court turns to consideration of the parties' arguments for and against summary judgment and the legal standards applicable to Gordon's FMLA retaliation claim.

## B. Arguments Of The Parties

### 1. Gerard's argument for summary judgment

Gerard contends, first, that, just because it continued to employ Gordon for a brief period after her FMLA leave expired does not mean that Gerard extended Gordon's FMLA leave. Rather, Gerard contends that nothing precluded it from providing more generous policies than the FMLA required. Gordon also contends that alleged assurances of continued employment after the conclusion of FMLA leave do not, as a matter of law, extend an employee's FMLA leave. Rather, Gerard contends that notice of requirements and benefits under the FMLA must be given in writing, and Gerard provided such written notice through its handbook and the December 3, 2003, and March 2004 letters from Dodge to Gordon. While Gerard concedes that supposed assurances of continued employment might give rise to state-law claims, they do not give rise to FMLA claims and, in any event, neither Dodge nor Wheeler gave Gordon any such assurances. Instead, Gerard contends that Dodge and Wheeler only told Gordon her job was safe as long as she was on FMLA leave.

Turning to arguments of more interest here, in light of Gordon's clarification of her position, as described below, Gerard contends that, as a matter of law, it was entitled to terminate Gordon at the conclusion of her FMLA leave, pursuant to 29 C.F.R. §§ 825.214 and 825.311(c). Gerard contends that this is so, because Gordon was unable to perform

the essential functions of her job and did not provide a certification of fitness for duty at the end of her FMLA leave, where such certification was required pursuant to Gerard's written policy. Gerard contends that Gordon cannot show "retaliation" simply because she was terminated after she had exhausted her FMLA leave, where she did not provide the required certification of fitness for duty. To put it another way, Gerard contends that there is no evidence that Gordon suffered retaliation, but simply evidence that her FMLA leave had expired and that she could not provide a timely certificate of fitness for duty. Once she had been terminated for failure to provide the necessary certificate, Gerard contends that nothing compelled it to revisit its decision to terminate her.

### 2. *Gordon's response*

In response, Gordon contends that, even if she received all the FMLA leave to which she was entitled, she has still generated genuine issues of material fact that she was terminated in retaliation for exercising her rights under the FMLA and for questioning Gerard's calculations of her FMLA leave. The focus of her contentions is that she has generated genuine issues of material fact that Gerard's explanations for terminating her simply are not credible. For example, she points out that Parnell relied on staffing requirements as an explanation for terminating Gordon, but that Parnell did not even know what the staffing requirements were. Moreover, she points out that terminating her only exacerbated the staffing shortage. She also contends that the argument that she did not provide an adequate certification of fitness for duty, because she submitted such a certification on a Fort Dodge Community School District form, is not credible, because Wheeler told her she could use that form. Moreover, she contends that Parnell admitted that she did not know what she would have done if Gordon had submitted an adequate form, which suggests that the validity of the form was not really the issue. Gordon also points out that Parnell never bothered to tell her that the form she had provided was invalid

or unacceptable. Moreover, she contends that there is evidence in the record that both Wheeler and Dodge told her that her job was not in jeopardy and that if she ran out of FMLA leave before she obtained a fitness-for-duty certificate, she could simply request additional personal leave. She points out, as well, that the decision to terminate her had actually been made *before* she ran out of FMLA leave and despite the fact that she had told Wheeler and Dodge that she expected to be certified for work without restrictions on April 5, 2004.

Gordon clarifies that she is *not* contending that her entitlement to FMLA leave continued beyond April 9, 2004, as Gerard seems to think; rather, she is contending that Gerard discharged her for exercising her FMLA rights. She contends that the protection from retaliation is not limited to employees currently on FMLA leave. She also points to inconsistencies in the reasons given for her termination, and the fact that the supposed decisionmakers never relied on a right to terminate her because she had not provided a certificate of fitness for duty, but instead relied on "staffing issues," and her supposed inability to perform restraints. Gordon also clarifies that the crux of her claim is not that she received oral assurance of continued employment, but that she suffered retaliation for exercising her FMLA rights. Thus, she contends that the cases on which Gerard relies for the proposition that oral agreements are not actionable under the FMLA are irrelevant, because they say nothing about retaliation for exercising FMLA rights. What the oral assurances she received do, Gordon contends, is estop Gerard from asserting that it could terminate her upon the expiration of her FMLA leave.

Contrary to Gerard's contentions, Gordon contends that she has presented a *prima facie* case of retaliation, because she exercised FMLA rights, suffered adverse employment action (termination), and has shown a causal link between the adverse employment action and the exercise of her FMLA rights. She contends that she has also generated genuine

issues of material fact that Gerard's supposedly legitimate, non-discriminatory reasons for terminating her are not worthy of credence and that the real reason for her termination was her use of FMLA leave and her questions about Gerard's calculation of her FMLA leave.

### 3. *Gerard's reply*

In its very brief reply brief, Gerard contends that Gordon's contentions that it miscalculated her FMLA leave are irrelevant, because Gordon does not dispute that her FMLA leave had expired on March 29, 2004. Gerard contends that it is also undisputed that Gordon had not provided a fitness-for-duty certification prior to the exhaustion of her FMLA leave, so that her job was no longer protected after March 29, 2004. Therefore, Gerard contends that it properly decided to terminate Gordon on March 26, 2004. Furthermore, Gerard argues that its offer of the opportunity for Gordon to work until April 9, 2004, after her FMLA leave had expired, did not grant any sort of extension of her FMLA leave, and nothing required Gerard to change the termination decision. In essence, Gerard contends that there simply cannot be a viable retaliation claim, where an employee is terminated for failure to provide a fitness-for-duty certification upon the expiration of her FMLA leave.


## C. Retaliation Claims Under The FMLA

The Family and Medical Leave Act of 1993 (FMLA), 29 U.S.C. §§ 2601-2654, "entitles eligible employees to take a total of twelve weeks of leave during a twelve-month period due to 'a serious health condition that makes the employee unable to perform the functions of the position of such employee.'" *Throneberry v. McGehee Desha County Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005) (quoting 29 U.S.C. § 2612(a)(1)(D)); *Sanders v. May Dep't Stores Co.*, 315 F.3d 940, 943 (8th Cir.), *cert. denied*, 539 U.S. 942 (2003); *Darby v. Bratch*, 287 F.3d 673, 679 (8th Cir. 2002). Furthermore, "[w]hen an employee

completes her FMLA leave, she is generally entitled to be restored to the position she occupied before she took leave." *Id.* (citing 29 U.S.C. § 2614(a)(1)); *Darby*, 287 F.3d at 679 ("'[U]pon return from FMLA leave, employees are entitled to reinstatement to the same or an equivalent position without the loss of benefits . . . .'") (quoting *Spangler v. Federal Home Loan Bank of Des Moines*, 278 F.3d 847, 851 (8th Cir. 2002)). Also, the FMLA "prohibits employers from discriminating against employees for exercising their rights under the Act." *Smith v. Allen Health Sys., Inc.*, 302 F.3d 827, 832 (8th Cir. 2002) (citing 29 U.S.C. §§ 2612, 2615(a)(2) (2000)). Thus, the Eighth Circuit Court of Appeals has recognized that "[r]etaliation through an adverse employment action based on an employee's exercise of FMLA rights is actionable." *McBurney v. Stew Hansen's Dodge City, Inc.*, 398 F.3d 998, 1002 (8th Cir. 2005); *Smith*, 302 F.3d at 832; *Darby*, 287 F.3d at 679.

"An employee can prove FMLA retaliation circumstantially, using a variant of the burden shifting test established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973)." *Id.*; *Smith*, 302 F.3d at 832. More specifically, "[t]o establish a prima facie case of retaliation, [the plaintiff] must show [1] that he exercised rights afforded by the Act, [2] that he suffered an adverse employment action, and [3] that there was a causal connection between his exercise of rights and the adverse employment action." *Id.*; *Smith*, 302 F.3d at 832; *Darby*, 287 F.3d at 679. But, as the Eighth Circuit Court of Appeals has explained, "the *McDonnell Douglas* battle is only begun with the prima facie case. If the employer comes forward with evidence of a legitimate, nondiscriminatory reason for its treatment of the employee, the employee must then point to some evidence that the employer's proffered reason is pretextual." *Smith*, 302 F.3d at 833.

### D.  Gordon's FMLA Retaliation Claim

Gerard's motion for summary judgment implicates each step in the *McDonnell Douglas* burden-shifting analysis of Gordon's FMLA retaliation claim.  Therefore, the court will consider each stage of that analysis in turn.

### 1.      Gordon's prima facie case

The parties do not dispute that Gordon can make an adequate showing on the first and second elements of her *prima facie* case, because she has shown that she exercised rights afforded by the FMLA, and that she suffered an adverse employment action, specifically, termination. *McBurney*, 398 F.3d at 1002 (the first two elements of the *prima facie* case are exercise of rights afforded by the Act, and that the employee suffered an adverse employment action); *Smith*, 302 F.3d at 832 (same); *Darby*, 287 F.3d at 679 (same).  What the parties dispute vehemently is whether Gordon can make the necessary showing on the third element of her *prima facie* case, "that there was a causal connection between [her] exercise of rights and the adverse employment action." *Id.*; *Smith*, 302 F.3d at 832; *Darby*, 287 F.3d at 679.

As to that third element, in a recent FMLA case, the Eighth Circuit Court of Appeals recognized that "the kind of causal connection required for a prima facie case is not 'but for' causation, but rather, a showing that an employer's 'retaliatory motive played a part in the adverse employment action.'" *McBurney*, 398 F.3d at 1003 (quoting *Kipp v. Missouri Highway & Transp. Comm'n*, 280 F.3d 893, 897 (8th Cir. 2002)).  Also, "[a]lthough not dispositive, the time lapse between an employee's protected activity and the employer's adverse action is an important factor when evaluating whether a casual connection has been established." *Id.* (noting that the court had previously held that a two-month interval between protected activity and termination "diluted any inference of causation," so that the six month interval in the case then before the court was simply too

long for the inference of causation to arise); *but see Smith*, 302 F.3d at 832 ("We have discounted, albeit with qualification, the possibility that mere temporal proximity between protected act and adverse employment action can establish the necessary causal connection: 'Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation.'") (quoting *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir.) (*en banc*), *cert. denied*, 528 U.S. 818 (1999)). The Eighth Circuit Court of Appeals has explained that the key to determining whether temporal proximity is or is not enough, standing alone, to show "causation" appears to be "the length of time between protected activity and adverse action." *Smith*, 302 F.3d at 833. Thus, "'[t]he cases that accept mere temporal proximity between an employer's knowledge of protected activity and an adverse employment action as sufficient evidence of causality to establish a prima facie case uniformly hold that the temporal proximity must be very close.'" *Id.* (quoting *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (*per curiam*), with internal quotation marks omitted).

Here, Gordon contends that she has shown such "very close" temporal proximity, where her termination followed immediately upon the heels of, indeed just prior to, the expiration of her FMLA leave. She points out that the decision to terminate her was made, or at least communicated to her, on March 26, 2004, but that her FMLA leave did not actually expire until March 29, 2004. Even if the court considers evidence that Gerard thought that Gordon's FMLA leave had expired on March 16, 2004, *see* Defendant's Appendix at 39 (March 29, 2004, follow-up letter from Dodge to Gordon indicating that Gerard thought Gordon's leave had expired on March 16, 2004), the termination was in close temporal proximity to end of her protected leave. Gordon contends, and the court agrees, that a reasonable juror could conclude from such very close temporal proximity that Gerard was simply waiting for the expiration of Gordon's FMLA leave to terminate

her in retaliation for taking FMLA leave and having the audacity to question Gerard's calculation of that leave. The Eighth Circuit Court of Appeals has also explained that an "extra quantum of evidence" that may satisfy the causation requirement is "[a] pattern of adverse actions that occur just after protected activity." *Smith*, 302 F.3d at 832. The court reiterated, however, that "even without a pattern, we have sometimes held that the timing of one incident of adverse employment action following protected activity sufficed to establish causal connection," and that the court had so held even after the *en banc* decision in *Kiel*, which suggested that more than mere temporal proximity was required. *Id*. Here, although Gordon does not argue that there was such a "pattern" to provide an "extra quantum of evidence," her termination is plainly a very serious adverse employment action and was, in this case, sufficiently close in time to the end of her FMLA protection, to generate a genuine issue of material fact on the necessary causal connection. *Id.* Therefore, the temporal proximity between the expiration of Gordon's rights under the FMLA, whether the court considers the March 16, 2004, date Gerard was using at the time or the March 29, 2004, date the parties now agree is correct, and the adverse employment action of Gordon's termination, which occurred on March 26, 2004, and became effective on April 9, 2004, does reasonably satisfy the only disputed element of Gordon's *prima facie* case of retaliation in violation of the FMLA.

### 2. *Gerard's legitimate reason*

In response to Gordon's *prima facie* case, Gerard has asserted, as a legitimate, non-discriminatory (*i.e.*, non-retaliatory) reason for its decision to terminate Gordon, that Gordon's FMLA leave had expired, but she had not provided the required fitness-for-duty certification. *See Smith*, 302 F.3d at 833 (if the plaintiff presents a *prima facie* case, the employer must come forward with evidence of a legitimate, nondiscriminatory reason for its treatment of the employee). Such an assertion satisfies the light burden on an employer

at the second stage of the *McDonnell Douglas* burden-shifting analysis, particularly where the pertinent regulation under the FMLA does, indeed, provide that, where an employer requires a fitness-for-duty certification upon the conclusion of FMLA leave, and has so notified the employee, "unless the employee provides either a fitness-for-duty certification or a new medical certification for a serious health condition at the time FMLA leave is concluded, the employee may be terminated." 29 C.F.R. § 825.311(c); *see also Barnes v. Ethan Allen, Inc.*, 356 F. Supp. 2d 1306, 1311 (S.D. Fla. 2005) ("If uniformly-applied, federal law allows employers to require such certification. 29 C.F.R. § 825.310(a). Upon proper notice, . . . an employer may terminate an employee who fails to provide certification 'at the time FMLA leave is concluded.' 29 C.F.R. § 825.311(c)." ), *aff'd*, 2005 WL 2053866 (11th Cir. Aug. 26, 2005); *Hanson v. Sports Auth.*, 256 F. Supp. 2d 927, 836 (W.D. Wis. 2003) ("Plaintiff's failure to report for work with the required certification meant that defendant could terminate her.") (citing 29 C.F.R. § 825.311(c)).

### 3. *Gordon's showing of pretext and retaliation*

Where, as here, an employer makes the necessary showing of a legitimate, non-retaliatory reason for its actions, the plaintiff must, at the third stage of the *McDonnell Douglas* burden-shifting analysis, "present evidence that (1) creates a question of fact as to whether [the employer's] proffered reason was pretextual and (2) creates a reasonable inference that [the employer] acted in retaliation." *Smith*, 302 F.3d at 833. To show pretext, the employee must show that the employer's justification for the firing "was unworthy of credence." *Id.* (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)). Here, the court finds that Gordon has pointed to more than adequate evidence to generate genuine issues of material fact that Gerard's proffered explanation is unworthy of credence, suggesting that the proffered reason is a pretext, and that the real reason was retaliation.

### *a.* *Gordon's showing of pretext*

One way to show that the employer's justification is "unworthy of credence," in order to meet the "pretext" prong at this stage of the *McDonnell Douglas* burden-shifting analysis, is to show that there were "'[s]ubstantial changes over time in the employer's proffered reason for its employment decision.'" *Id*. at 835. Gordon has pointed to shifting or inconsistent explanations for her termination, running from her inability to provide restraints (the only reason that she claims she was given in the March 26, 2004, meeting), to staffing hardships, to failure to provide a "clear idea" of when her work restrictions would be lifted, to what she contends is a *post hoc* explanation that she had failed to provide a fitness-for-duty certification as required. *Id*. The court finds that some discrepancies between and among the accounts of the March 26, 2004, meeting by Dodge, Wheeler, and Gordon, further discrepancies between Dodge's March 29, 2004, letter and Parnell's explanation in her deposition, and discrepancies between all of those "reasons" and Gerard's present contention that Gordon had failed to provide a fitness-for-duty certification, which was not mentioned by Dodge or Wheeler in the nearly contemporaneous memoranda of the March 26, 2004, meeting, or by Parnell in her subsequent deposition, are sufficient to give rise to an inference that the explanations by Gerard for terminating Gordon are not worthy of credence and are, hence, pretexts for a retaliatory discharge.

In addition, Gordon contends that the proffered reasons are all so unsound as to suggest that they are pretexts. Gordon has pointed to evidence that she was capable of performing restraints by mid-March 2004, and that she had told Dodge and Wheeler that she expected to be released to full-time work without restrictions after her appointment with the specialist on April 5, 2004. This evidence, she contends and the court finds, seriously undercuts the credibility of explanations that Gordon was being terminated

because she could not provide restraints when needed and that she had provided no "clear idea" of when she would be able to work without restrictions.

Similarly, Gordon has pointed to evidence that Parnell did not know the staffing requirements at the Fort Dodge Day Treatment Program, that Gordon often worked alone when she was working, and that terminating her only exacerbated any staffing problems. The court agrees that this evidence is also sufficient to generate genuine issues of material fact that the explanations for Gordon's termination that she could not perform her job, that Gerard did not know when she would be able to do so, and that her continued restrictions were causing staffing problems, are not worthy of credence and, hence, are pretextual.

Moreover, while Gerard's assertion that it could legally fire Gordon when she did not provide a fitness-for-duty certification is "legitimate," because it is authorized by a pertinent regulation, 29 C.F.R. § 825.311(c), there is sufficient evidence in the record to generate genuine issues of material fact that this explanation, nevertheless, is merely a pretext. Gordon is correct that the contemporaneous explanations from Dodge and Wheeler did not include reliance on her failure to provide a fitness-for-duty certification, only reliance on the much more nebulous explanation of uncertainty about when she would be able to return to full duty. The March 5, 2004, letter from Dodge, which included a demand for "an updated medical opinion on your ability to return to your normal work schedule with or without restrictions," and gave notice that, according to Gerard's records, Gordon would exhaust her FMLA leave "the week of March 8th," did *not* expressly state either a demand or a reminder that Gordon must provide a fitness-for-duty certification in compliance with Gerard's specifications and policies. *See* Defendant's Appendix at 35. Furthermore, the vagueness with which any such demand or reminder might have been implied by the letter is such that the inference, if any, that such a demand or reminder was made should be left to a jury.

25

Undercutting further reliance on this explanation is the fact that it is not as unequivocally supported by the pertinent regulation as Gerard seems to suggest. Section 825.311 of Title 29 of the Code of Federal Regulations explains "[w]hat happens if an employee fails to satisfy the medical certification and/or recertification requirements." 29 C.F.R. § 825.311. The pertinent part of the regulation, for present purposes, provides as follows:

> (c) When requested by the employer pursuant to a uniformly applied policy for similarly-situated employees, the employee must provide medical certification at the time the employee seeks reinstatement at the end of FMLA leave taken for the employee's serious health condition, that the employee is fit for duty and able to return to work (see § 825.310(a)) if the employer has provided the required notice (see § 825.301(c); *the employer may delay restoration until the certification is provided.* In this situation, unless the employee provides either a fitness-for-duty certification or a new medical certification for a serious health condition at the time FMLA leave is concluded, *the employee may be terminated.* See also § 825.213(a)(3).

29 C.F.R. § 825.311(c) (emphasis added). Thus, pursuant to this regulation, "[i]f uniformly-applied, federal law allows employers to require such certification, [and] [u]pon proper notice, . . . an employer may terminate an employee who fails to provide certification 'at the time FMLA leave is concluded.'" *Barnes*, 356 F. Supp. 2d at 1311 (quoting 29 C.F.R. § 825.311(c)); *Hanson*, 256 F. Supp. 2d at 836 ("Plaintiff's failure to report for work with the required certification meant that defendant could terminate her.") (citing 29 C.F.R. § 825.311(c)). On the other hand, the regulation also provides that "an employer may delay restoration until an employee submits the required 'fitness-for-duty' certification." *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 246 (6th Cir. 2004) (citing 29 C.F.R. §§ 825.310(f), 825.311(c) & 825.312(c)). Thus, instead of firing

Gordon, the regulation also authorized Gerard simply to delay Gordon's restoration to full duty until she provided the fitness-for-duty certification, which according to Gordon's evidence, she had told Wheeler and Dodge she would be able to do on April 5, 2004. Where the regulation permitted either of two choices, the court concludes that it should consider whether the circumstances identified by the plaintiff are sufficient to generate genuine issues of material fact that the employer chose the more severe option for a retaliatory reason. Gerard's failure to acknowledge that the regulation also permitted a less severe option is evidence from which a reasonable juror could infer that the employer's reliance on the more severe option is a pretext for retaliation. To put it another way, the fact that an employer *can* do something does not necessarily insulate it from liability for *doing* that something, where other evidence suggests pretext and retaliation.

Moreover, Gerard's decision to terminate Gordon, rather than simply delay her restoration to full duties, when Gerard had not yet received her fitness-for-duty certification, appears to be contrary to Gerard's own policy, which reasonably suggests that reliance on the authorization to terminate her was pretextual. The December 3, 2003, letter informing Gordon that she qualified for twelve weeks of unpaid FMLA leave also gave notice of the requirement that, at the conclusion of her FMLA leave, Gordon "must provide a 'fitness for duty' physician statement before returning to work." Defendant's Appendix at 20. However, the attached "Employer's Response to Employee Request for Family and Medical Leave" explained, "If such certification is required but not received, *your return to work may be delayed* until the certification is provided," Defendant's Appendix at 22, ¶ 7 (emphasis added); it *did not* indicate that failure to provide the certificate could lead to termination. The court finds that a reasonable juror could interpret this letter to indicate that, faced with a regulation that permitted either delay in restoration to duty or termination if an employee failed to provide a fitness-for-duty certification when

27

required, Gerard had opted, as a matter of policy, for a delay in restoration to duty. The departure from that policy in a particular case then suggests pretext (and retaliation). There is at least a genuine issue of material fact that terminating Gordon, under the circumstances presented here, was contrary to Gerard's express policy.

In short, the court finds that Gordon has "present[ed] evidence that creates a question of fact as to whether [the employer's] proffered reason was pretextual." *Smith*, 302 F.3d at 833.

### *b.    Gordon's showing of retaliation*

The court finds that Gordon has also presented evidence that "creates a reasonable inference that [the employer] acted in retaliation." *Id.* (second prong of the third stage of the burden-shifting analysis). Beginning with Gerard's reliance on Gordon's failure to provide a fitness-for-duty certification, the court notes that Gordon did provide a fitness-for-duty certification from Dr. Worrell on April 5, 2004, as she had predicted she would be able to do. It is true that an employee may not keep her job restoration rights open indefinitely by delaying her fitness-for-duty certification, because "[s]uch an approach would distort the careful balance between employer and employee rights that Congress hoped to achieve when it enacted the FMLA, as the drafters of the regulations realized in writing § 825.311(c)." *Hanson*, 256 F. Supp. 2d at 936-37. Nevertheless, a reasonable juror could find that the period of only a few days between Gordon's exhaustion of her FMLA leave (whether March 29, 2004, or some earlier date in mid-March) and the date that she provided the fitness-for-duty certification was a reasonable period for Gerard simply to delay her restoration to full duty, rather than fire her. *See* 2 U.S.C. § 825.311(c) (providing that an employer may delay restoration to duty until the employee provides the required fitness-for-duty certification). This evidence that delaying Gordon's return to work for only a few days until after her April 5, 2004, doctor's appointment was

reasonable under the circumstances reasonably suggests that failure to provide a fitness-for-duty certification was not the real reason for terminating Gordon, but that her assertion of her FMLA rights was. The same is true of evidence that when Gordon asked in the March 26, 2004, meeting if she could come back to work if Dr. Raval called and released her, Dodge responded that "the decision was already made." Defendant's Appendix at 37.

Similarly, Parnell's rejection of the fitness-for-duty certification as "invalid" or "unacceptable" when it came, along with her testimony that she did not know what she would have done had the certification been "acceptable," suggests that the lack of a fitness-for-duty certification was not only an excuse, but that the real reason was a desire to get rid of an employee who had exercised her FMLA rights. The court in *Barnes* recognized that "the certification 'itself need only be a simple statement of the employee's ability to return to work,' according to 29 C.F.R. § 825.310(c)," although "it must be relevant to the employees' condition at the time FMLA leave is concluded." *Barnes*, 356 F. Supp. 2d at 1312 (finding a six-week-old note insufficient to qualify as a fitness-for-duty certification, because it was not relevant to the employee's condition at the time the employee's FMLA leave was concluded). The certification that Gordon believe that she could get from Dr. Raval on March 26, 2004, and the certification that she certainly did get from Dr. Worrell on April 5, 2004, both appear to meet these "simple statement" and "relevance" requirements, because they were or would have been contemporaneous statements about Gordon's fitness-for-duty. Reliance on the fact that Dr. Worrell's certification was on a form from the Fort Dodge Community Schools, even though it was admittedly a "standard" form, could also be taken by a reasonable juror as suggesting that Gerard was looking for excuses not to restore Gordon to full duty out of a retaliatory animus.

There is still more evidence in the record that a reasonable juror could take as suggesting that retaliation for Gordon's exercise of her FMLA rights and her questions about calculations of her FMLA leave were the real reasons for her termination. That evidence includes the pre-termination exchange of e-mails between Dodge and Parnell, in early March, in which Dodge described Gordon as "continu[ing] to push the envelope" with regard to FMLA leave, as "challenging" Gerard's calculations of her FMLA leave, and as "becom[ing] a problem" because of her questions about the calculation of her leave. Plaintiff's Appendix at 70 & 76. This evidence reasonably suggests that Dodge and Parnell were becoming hostile to Gordon's exercise of her FMLA rights and her audacity in questioning Gerard's calculations of her FMLA leave. It is a very small step from inferences of such hostility on the part of decisionmakers to a conclusion that the decisionmakers acted upon that hostility in taking adverse employment action.

Therefore, the court concludes that Gordon has pointed to evidence that "creates a reasonable inference that [the employer] acted in retaliation." *Smith*, 302 F.3d at 833. Thus, she has generated genuine issues of material fact at each stage of the *McDonnell Douglas* burden-shifting analysis.

### III. CONCLUSION

Because Gordon has generated genuine issues of material fact at each stage of the applicable burden-shifting analysis, she is entitled to present her FMLA retaliation claim to a jury. On the disputed element of her *prima facie* case, Gordon has shown sufficient temporal proximity between her protected activity and her termination to show a causal connection. Gerard's reliance on 29 C.F.R. § 825.311(c), which permits an employer to fire an employee who, like Gordon, had not provided a fitness-for-duty certification prior to the end of her FMLA leave, is a "legitimate" reason for its decision to terminate

Gordon. Nevertheless, Gordon has generated genuine issues of material fact, in this case, that Gerard's reliance on the authorization to terminate her in the regulation is a pretext and that the real reason is retaliation for the exercise of FMLA rights. That evidence includes the fact that the regulation on which Gordon relies authorized a delay in reinstatement, as well as termination, and other evidence suggesting that Gerard's proffered reason is pretextual and that the real reason was a retaliatory animus.

THEREFORE, Gerard's July 12, 2005, Motion For Summary Judgment (docket no. 10) is **denied**. This matter shall proceed to trial.

**IT IS SO ORDERED.**

**DATED** this 3rd day of October, 2005.

MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA